# Exhibit A

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

ICDR Case No. 01-22-0004-1325                          :

                                                       :

In the Matter of the Arbitration between               :

                                                       :

Mercantile Global Holdings Inc.,                       :

                                        Claimant,      :

                                                       :

                        And                            :

                                                       :

Hamilton M&A Fund SP,                                  :

                                  Respondent.   :

– – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

**FINAL AWARD**

**Steven Skulnik**
**Sole Arbitrator**

# Table of Contents

I.    THE PARTIES AND THE INVESTMENT AGREEMENTS ....................................................1

II.    DISPUTE RESOLUTION AND GOVERNING LAW ........................................................2

III.    PROCEDURAL HISTORY .................................................................................................2

IV.    FACTUAL BACKGROUND ...............................................................................................7

    A.    The Parties' Transactions .........................................................................................7

    B.    Seizure of Hamilton's Funds in the US ....................................................................9

V.    THE PARTIES' CONTENTIONS .......................................................................................9

    A.    Hamilton's Contentions ..........................................................................................10

    B.    MGH's Contentions ................................................................................................13

VI.    ANALYSIS .......................................................................................................................17

    A.    Issue One: Should the Investment Agreements and the SPA be Considered as a Single, Integrated Transaction? ...............................................................................17

    B.    Issue Two: Is Hamilton's Performance Excused under Article 8.1 of the SPA? ...........18

    C.    Issue Three: Do the Doctrines of Waiver and Estoppel Bar Hamilton from Invoking Failure of Condition Precedent? ............................................................................19

    D.    Issue Four: Has MGH Proved Future Lost Profit Damages? ...........................................20

    E.    Issue Five: Has MGH Proved Damages Based on the Difference Between the Contract Price and Market Value? ..........................................................................23

    F.    Interest ....................................................................................................................26

    G.    Counsel Fees and Costs ..........................................................................................26

VII.    AWARD.............................................................................................................................28

I, THE UNDERSIGNED ARBITRATOR, having been appointed in accordance with the dispute resolution provisions of two Investment Agreements, signed on September 16, 2022, between Claimant Mercantile Global Holdings Inc. and Respondent Hamilton M&A Fund SP (the **Investment Agreements**), and having duly heard the submissions and evidence of the parties, hereby **FIND** and **AWARD**, as follows:

## I.    THE PARTIES AND THE INVESTMENT AGREEMENTS

1.    Claimant, Mercantile Global Holdings Inc. (**MGH**), a Delaware corporation, is a bank holding company. Its subsidiary, Mercantile Bank International (**MBI**), is a digital asset custody bank under the supervision of the Puerto Rico Office of the Commissioner of Financial Institutions (**OCIF**).

2.    Respondent Hamilton M&A Fund, SP (**Hamilton**) is a segregated portfolio company of Hamilton Opportunity Fund, SPC (**HOF**). HOF is a Cayman Islands segregated portfolio company operating as a mutual fund under Section 4(3) of the Mutual Funds Act (Revised) of the Cayman Islands. (MGH and Hamilton will sometimes be referred to as the **Parties**.)

3.    Prior to the Investment Agreements, which are the subject of this arbitration, on December 1, 2021, MGH and HOF entered into a subscription agreement in which HOF acquired shares in MGH (the **December Agreement**) (RX A).[1] The December Agreement granted HOF an option to purchase 100% of the issued and outstanding shares of MGH's various stock classes (the **First Option**) and an option to acquire new, additional MGH Series A-2 Preferred Stock to be issued at closing (the **Second Option**).

4.    One of the Investment Agreements provides for Hamilton to exercise the Second Option in the December Agreement. The other Investment Agreement

---

[1] CX refers to Claimant's exhibits and RX refers to Respondent's exhibits.

provides for Hamilton to purchase additional shares of Class A Common Stock. CX 1 and CX 2.

## II.  DISPUTE RESOLUTION AND GOVERNING LAW

5.   Section 9(a) of each of the Investment Agreements states, in relevant part, as follows:

> This Investment Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of laws thereof. Any controversy or claim arising out of or relating to this Investment Agreement or the breach thereof, shall be determined through confidential binding arbitration administered pursuant to the expedited rules of the AAA and the judgment on the award rendered therein may be entered in any court having jurisdiction thereof. Each party shall initially be responsible for its own attorney fees, costs, and expenses of arbitration. The arbitrator may include, in the award, an assessment of expenses of arbitration and the costs thereof with an award of reasonable attorney fees to the prevailing party.

6.   The arbitration clause does not specify an arbitral seat.

## III.  PROCEDURAL HISTORY

7.   The Tribunal does not consider it necessary to describe the entire procedural history. I describe here only the procedural rulings related to the presentation of claims and defenses in this Arbitration.

8.   MGH commenced this Arbitration on September 30, 2022 by service of a Notice of Intention to Arbitrate and Statement of Claim on Hamilton. The International Centre for Dispute Resolution (**ICDR**), the international division of the American Arbitration Association (**AAA**), acknowledged receipt on October 6, 2022. On November 4, 2022, MGH filed its Corrected Demand for Expedited Arbitration. On December 29, 2022, Hamilton filed its Answer to Corrected Demand for Expedited Arbitration.

MGH is represented in this arbitration by:

2

Mark Klapow
Laura Schwarz
Michael Williams
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

and

Jean G Vidal Font
FERRAIUOLI LLC
221 Ponce de Leon Ave, 5th Floor
San Juan, PR 00917

9.    Hamilton is represented in this arbitration by:

Jeremy W. Schulman
Jeffrey S. Gavenman
Sabina Schiller
Mace Phillips
SCHULMAN BHATTACHARYA, LLC
6116 Executive Boulevard, Suite 425
North Bethesda, MD 20852[2]

10.    The Tribunal, which was selected by the Parties in accordance with the Investment Agreements, and whose appointment was formalized by the ICDR through its letter dated April 19, 2023, is:

Steven Skulnik
438 West 23rd St.
New York, NY 10011

11.    In its April 19, 2023 letter to the Tribunal, the ICDR noted that "[t]his matter is being administered under the International Dispute Resolution Procedures as in effect March 1, 2021" (the **ICDR Rules**). On April 21, 2023, the ICDR notified the Parties of the Tribunal's appointment. The Tribunal made certain

---

[2] Prior to the evidentiary submissions, Pietrantoni Mendez & Alvarez LLC, Ballard Spahr LLP, and McConnell Valdes LLC made submissions on behalf Hamilton or its affiliates. Once the Schulman firm appeared, in June 2023, it took the lead.

disclosures, to which the Parties had no objection. The Tribunal's appointment was reaffirmed by the ICDR by letter dated May 10, 2023.

12.    As noted above, the arbitration clause provides for expedited arbitration. Therefore, the International Expedited Procedures also apply.

13.    Upon its appointment, the Tribunal scheduled a procedural conference to be held by videoconference on May 26, 2023. By email dated May 18, 2023, the Tribunal requested, among other things, that the Parties meet and confer regarding choosing the arbitral seat and to be ready to discuss that issue at the procedural conference.

14.    The procedural conference was held as scheduled and resulted in Amended Procedural Order #1, dated May 26, 2023 (**PO1**), providing, among other things, that:

    a.  The Parties confirmed there are no conditions precedent that must be satisfied before the jurisdiction of the Tribunal vests.

    b.  The Parties confirmed that the Tribunal has jurisdiction to determine the claims asserted in the pleadings filed in this Arbitration.

    c.  The Parties agreed that the arbitral seat is New York, NY and that the arbitration is to be conducted in English.

    d.  The Parties agreed that the substantive law applicable to this dispute is Delaware law.

    e.  The Parties agreed that the ICDR Rules and the International Expedited Procedures apply.

    f.  Claimant would identify its expert by June 5, 2023, and Respondent would identify its expert by July 5, 2023.[3]

_____

[3] Because Claimant has the burden of proof on damages, it was agreed that Claimant would submit its written expert testimony in the first round of submissions and Respondent would

g.  Both sides would make their first written merits submissions by June 28, 2023.

h.  After receipt of the first submissions, the Parties would confer on whether an exchange of documents material to the dispute and not already included in the written submissions is appropriate. Any disputes concerning document disclosure would be promptly submitted to the Tribunal for decision by means of a Redfern schedule.

i.  Both sides would make their responsive written merits submissions by July 14, 2023.

j.  The merits hearing would proceed at 10:00 am EDT on July 24, 2023, at the offices of the AAA/ICDR, 150 East 42nd Street, New York, NY 10017.

k.  The arbitral award would state the reasons on which it rests.[4]

15.    On June 28, 2023, Claimant submitted a memorandum of law and witness statements of James Collins and Rene Carson, with exhibits. Claimant also submitted an expert report from David Abshier and John Hekman with exhibits. On the same day, Respondent submitted a memorandum of law and a witness statement from Georgette Adonis-Roberts with exhibits.

16.    Also on June 28, 2023, the Parties submitted a confidentiality stipulation, which the Tribunal "so ordered" on June 29, 2023.

---

offer rebuttal expert evidence during the second round. This order of presentation was confirmed by an email from the Tribunal on June 11, 2023. Each side was required to disclose its expert a few weeks before the deadline for each report to ensure there was no conflict of interest.

[4] PO 1 also memorialized that Respondent requested early disposition / bifurcation regarding liability before submitting proof regarding damages. Respondent was given until June 2, 2023 to request leave to do so under Article 23 of the ICDR Rules. On June 2, 2023, Respondent notified the Tribunal that it "decided against seeking leave to file an application for bifurcation and early disposition."

17.     The Parties then discussed the exchange of information under Article 24 of the ICDR Rules. A dispute arose over certain requests for documents made by Respondent to Claimant. The Parties submitted a Redfern Schedule on July 13, 2023. The Tribunal made rulings on the Redfern Schedule on July 14, 2023.[5]

18.     On July 18, 2023, Claimant submitted a reply memorandum of law, a witness statement from Eric Edwards,[6] and a supplemental witness statement from Rene Carson. On the same day, Respondent submitted a reply memorandum of law, a supplemental witness statement from Georgette Adonis-Roberts, and an expert report from Keith A. Hock. Both sides submitted additional exhibits.

19.     On July 20, 2023, Claimant's counsel advised Respondent's counsel that they wished to cross-examine Ms. Adonis-Roberts. Respondent's counsel advised that they would make her available for cross-examination via videoconference because she was in the Middle East and would not be able to make arrangements to attend the hearing in-person. Claimant's counsel objected and asked the Tribunal to strike her witness statement. The Tribunal denied the request to strike and advised counsel that it would hear her oral testimony by videoconference.

20.     The merits hearing was held as scheduled on July 24 and 25, 2023. Oral testimony was given by Mr. Collins, Ms. Carson, Ms. Adonis-Roberts (via videoconference), Mr. Abshier, Dr. Hekman, and Mr. Hock.

21.     The Tribunal received post-hearing memoranda of law and costs submissions on August 15, 2023. On August 21, 2023, MGH updated its costs submission.

---

[5] Claimant's main objection to the requests for information was that Article 24 of the ICDR Rules does not apply to cases under the International Expedited Procedures. Respondent's requests for documents were limited and targeted and would not interfere with the expedited schedule. The Tribunal overruled that objection.

[6] Mr. Edwards is President of MBI. By email dated July 21, 2023, counsel for Hamilton advised that Hamilton was not challenging Mr. Edwards' testimony and he need not attend the hearing to be cross-examined. Mr. Edwards attended the hearing as an observer.

## IV.   FACTUAL BACKGROUND

22.    This section summarizes the facts the Tribunal considers relevant to determine the issues in this Arbitration. Except where disputed facts are identified below, the facts recited in this section are largely undisputed. To the extent that there is any disagreement as to the facts recited here that are not identified as disputed, they constitute findings of fact by the Tribunal.

### A. The Parties' Transactions

23.    In 2017, Mr. Collins, MGH's CEO and Chair of the Board, and others founded MGH "as an accelerator for ideas in fintech." Collins WS ¶3.[7] MBI obtained regulatory approval to operate and launched its business in early 2019. *Id.* ¶4.

24.    HOF and Hamilton are managed by Hamilton Investment Management Ltd., a company organized and operating under the laws of the British Virgin Islands. Adonis-Roberts WS ¶ 4.[8]

25.    After engaging in preliminary discussions, HOF and MGH agreed that HOF or its affiliate would acquire MGH through a series of stock purchases. The transaction was documented by the December Agreement. RX A.

26.    The December Agreement provides for HOF to purchase newly issued shares of MGH's Series A-2 Preferred Stock for an aggregate purchase price of $1,000,000.00. *Id.* at 1. Section 2(a) of the December Agreement provides HOF (or its affiliate) with an option to purchase 100% of the issued and outstanding shares of MGH's various stock classes (the **First Option**). According to the December Agreement, the aggregated value of the shares to be acquired through the exercise of this First Option totaled $12,610,747.00. *Id.* at § 2(b). Section 2(b) of the December Agreement also grants HOF or its affiliate the option to acquire

---

[7] Witness statements will be referred to as "WS."

[8] Georgette Adonis-Roberts is a former Associate Director - Legal and Compliance of Hamilton Capital Holding Ltd., another affiliate of Hamilton and HOF.

additional shares of MGH's Series A-2 preferred stock for $12,089,253.00 (the **Second Option**).

27.     MGH and HOF then executed a series of agreements (the **Subscription Agreements**). RX B-E. Hamilton and MGH also entered into a Revolving Loan Facility Agreement of $1 million on July 18, 2022. RX F. MGH then drew down $450,000 under the Revolving Loan Facility Agreement. Adonis-Roberts WS ¶ 11. The capital Hamilton provided to MGH before September 16, 2022, via the December Agreement, Subscription Agreements, and the Revolving Loan Facility, was to ensure that MGH and MBI remained operational while awaiting regulatory approval of the acquisition of MGH by Hamilton. *Id.* ¶ 12. Hamilton is an "Affiliate" of HOF as that term is defined in the December Agreement because, as a segregated portfolio of HOF, Hamilton is under common control with HOF and the Fund Manager. Hamilton therefore had the same purchase rights as HOF under the December Agreement. *Id.* ¶ 13.

28.     Any investment of over ten percent in an OCIF-regulated entity like MBI requires OCIF's approval in advance (a so-called change-of-control transaction). Collins WS ¶ 57. In April of 2022, the Parties submitted their written request to OCIF to allow Hamilton's proposed investment. CX 9. On August 2, 2022, OCIF approved the transactions proposed by the Parties, subject to the terms and conditions of its letter, including closing within 30 days. CX 10. The Parties then asked for and received an extension of time to close until September 16, 2022. CX 14 at 3.

29.     The Parties then negotiated the further agreements contemplated by the December Agreement. Part of Hamilton's funds (about $13 million) was to be used to purchase the outstanding shares of MGH held by its legacy investors. A Stock Purchase Agreement (**SPA**) was negotiated to reflect that purchase. RX G. The Parties also negotiated an Exchange Agreement and Plan of Reorganization. RX H. In addition, there were the two Investment Agreements at issue in this

Arbitration (CX 1 and 2) totaling about $37 million to provide working capital and to retire existing debt.

30.     On Friday, September 16, 2022, the Parties signed the four agreements referred to above. At 4:11 p.m. that day, Hamilton instructed its bank, Silvergate Bank, to wire the approximately $49 million (the total purchase price under the SPA and two Investment Agreements) to MGH. RX K.

## B. Seizure of Hamilton's Funds in the US

31.     Before the wire transaction could be completed, on Sunday, September 18, 2022, the US Government seized funds on deposit from Hamilton and its affiliates in connection with an investigation of certain of Hamilton's principals for fraud and money laundering, among other crimes. *See* CX 53 ¶ 54 (d) (the indictment allegation that the Government seized funds from account number 5090042770, the account from which wired funds were to come from).[9] The Parties were not notified of the seizure at the time and they each prodded Silvergate Bank for an explanation. *See, e.g.*, CX 43. It is undisputed that the seizure of funds went into effect and remains in effect. Hamilton does not have any funds other than the funds held at Silvergate. Adonis-Roberts WS ¶ 23.[10]

## V.   THE PARTIES' CONTENTIONS

32.     Hamilton concedes that the Investment Agreements were made but not performed. Hamilton's defense is that performance was excused. Therefore, this Award will present Hamilton's contentions first and MGH's responses thereto second.

---

[9] The indictment was not filed until March 6, 2023 and was unsealed on March 15, 2023. The allegations in the indictment were not known to the Parties at the time of seizure.

[10] HOF and its affiliates have other banking relationships, including with MBI. The Parties dispute whether other funds belonging to HOF or its affiliates were available to fund the purchases contemplated by the Investment Agreements and the SPA. Given the Tribunal's legal conclusions, this dispute is immaterial and will not be addressed further.

### A. Hamilton's Contentions

33.     Although formally separate, the Parties entered into both Investment Agreements and the SPA on the same date, and for a single purpose, *viz.*, Hamilton's acquisition of MGH. Hamilton concedes that the Investment Agreements do not contain any conditions precedent to closing. However, Hamilton points out, Recital "b" in both Investment Agreements refers to the SPA and the SPA contains conditions precedent to closing.[11]

34.     The SPA also defines "Transaction Documents" to include both Investment Agreements and article 11.6 of the SPA states "[i]n the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Schedules (other than an exception expressly set forth as such in the Schedules), the statements in the body of this Agreement will control."

35.     The portion of the SPA that Hamilton relies upon is article 8.1, which states:

8.1     Conditions to Obligations of All Parties. The obligations of each party hereto to **consummate the transactions contemplated by this Agreement** shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a) No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof; and

(b) No **Action** shall have been commenced against Buyer, Sellers or the Company, which would prevent the Closing.

---

[11] Hamilton explains that is not relying on the recitals to impose any rights or obligations, but rather as evidence that the contracts relate to a single transaction.

RX G; emphasis added.[12]

36.     Hamilton urges that (a) the Investment Agreements were part of the transactions contemplated by the SPA, (b) the seizure of Hamilton's funds by the US Justice Department is a "Governmental Order" that "has the effect of … restraining or prohibiting consummation of such transactions," and (c) the seizure was an Action[13] that prevented the closing.

37.     To support its argument that the transactions in these three agreements were part and parcel of one transaction, Hamilton cites the submission of the entire proposed transaction to OCIF for approval. CX 9. From this, citing *Doehler N. Am., Inc. v. Davis*, 2023 WL 3569775, at*3 (D. Del. May 19, 2023), Hamilton argues that related contemporaneous documents must be read together, as one contract.[14] Hamilton also cites *Ashall Homes Ltd. v. ROK Ent. Grp. Inc.*,992 A.2d 1239, 1250-51 (Del. Ch. 2010) for the proposition that share sale agreements and subscription agreements must be read together because "they also effectuated separate steps of a single integrated scheme…").[15]

38.     Turning to the SPA, Hamilton argues that, under article 8.1, the Government's seizure "has the effect of making the transactions contemplated by

---

[12] The Parties disagree on the meaning of the word "consummate." MGH says it means the signing of the SPA while Hamilton says it means the closing of the transaction.

[13] The SPA defines "Action" as "any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, investigations, notice of violation, proceeding, litigation, citation, summons or subpoena of any nature, including civil, criminal, administrative, regulatory or otherwise, whether at Law or in equity."

[14] The *Doehler* court cites prior Delaware court decisions and quotes 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 30:26 (4th ed. 2022) ("[T]he principle that all writings which are part of the same transaction are interpreted together also applies when incorporation by reference of another writing may be inferred from the context surrounding the execution of the writings in question.").

[15] Relatedly, Hamilton cites to law supporting a step transaction doctrine, requiring agreements to be read together, citing to cases such as *Coughlan v. NXP B.V.*, 2011 WL 5299491, at *7 (Del. Ch. Nov. 4, 2011) (applying step transaction doctrine to construe contracts when they were part and parcel of one transaction, which would result in joint venture's ownership of company's assets).

this Agreement illegal" within the meaning of article 8.1. Moreover, given the seizure, Hamilton argues, even if the wire transfer had succeeded, the Government could have seized those funds from MGH.[16]

39.     In any event, Hamilton argues, the seizure of all of Hamilton's funds "restrains" the transaction within the meaning of article 8.1. To support his argument, Hamilton cites *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 12-13 (2015) for the proposition that, read broadly, "restrain" can mean "inhibit," and, read narrowly, can mean "prohibit." Hamilton argues that the broad meaning should apply here because article 8.1 already contains the word "prohibit" so the word "restrain" must have been included to mean something else, *i.e.*, "inhibit."

40.     While conceding that it did not assert article 8.1 as supporting an excuse for not performing under the Investment Agreements until it filed pleadings in this Arbitration, Hamilton argues that it had no duty to make its legal arguments ahead of time. Hamilton also concedes that a party can, under doctrines such as waiver and estoppel, be precluded from relying on a failure of a condition as an excuse for nonperformance, but here, Hamilton urges, the elements of waiver and estoppel were not established. There is no evidence, Hamilton says, that it (a) intended to waive its excuse for not being able to wire the funds or (b) misled MGH as to any fact, a necessary element of estoppel.

41.     Hamilton argues that, even if its performance was not excused, MGH should collect no damages or only nominal damages. Hamilton argues that MGH's future lost profit models are unduly speculative in that those models rely on projections of MGH's lost future earnings when MGH has no history of prior earnings. Moreover, Hamilton criticizes MGH's damages expert, Dr. John Hekman,

---

[16] The seizure order (sometimes referred to as a seizure warrant) was not produced during the exchange of information. It cannot be known what the Government's position would have been had the wire transfer been made before the seizure.

for relying on the "McKenzie Valuation" (CX 8)[17] and not doing his own diligence to understand the basis for those projections or verify their reasonableness.

42.    Instead, Hamilton urges that the formula for damages in this case should be the difference between the contract price in the Investment Agreements and the market value of the shares to be purchased by Hamilton from MGH. In this case, Hamilton claims that the market value *is* the contract price because the Investment Agreements were the result of arms-length negotiations. Given no difference between those two measures, Hamilton says, the damages should be zero.

43.    Finally, Hamilton argues that any damages award must be offset by the $450,000 MGH drew down under the Revolving Loan Facility Agreement. Adonis-Roberts WS ¶ 11.[18]

## B. MGH's Contentions

44.    First, MGH argues that the Investment Agreements contain no conditions precedent. Moreover, MGH says, had full performance under the SPA been required as a condition precedent to performance of the Investment Agreements, the Parties would have structured the payment under the Investment Agreements to occur after all obligations under the SPA were fulfilled. Instead, Hamilton signed the Investment Agreements on September 16, 2022, and then immediately initiated performance by sending a wire to fund its obligations under the SPA and the Investment Agreements.

45.    Next, MGH argues, that even if the conditions stated in the SPA applied also to the Investment Agreements, "a party cannot *manufacture* the failure

---

[17] McKenzie & Associates appraised the value of MBI assuming that Hamilton invested $100 million in MBH and other assumptions given to it by the Parties.

[18] Hamilton also seeks, as an offset, $28.8 million that MBI allegedly took from bank accounts it held in the name of the "Himalaya Entities," which may be affiliates of Hamilton. *See* Adonis-Roberts WS ¶ 24. However, the US Government seized all but $5 million of that money. In any event, those accounts were not in the name of the Respondent in this arbitration and cannot be the basis of an offset. Put another way, this Tribunal has no jurisdiction to consider the claims, if any, of the Himalaya Entities against MBI.

of its own condition precedent," citing *WaveDivision Hldgs., LLC v. Millenium Digital Media Sys., L.L.C.,* 2010 WL 3706624, at \*14 (Del. Ch. Sept. 17, 2010) and other cases (emphasis in the original). Here, MGH argues, the only reason the SPA was not performed is because Hamilton did not deliver the proceeds required by *that* agreement. MGH argues that a failure to pay is no defense as a matter of law.

46.    In the alternative, MGH argues, even if article 8.1 of the SPA applied to the Investment Agreements, performance would only be excused if the seizure order restrained, prohibited, or rescinded the SPA or made it illegal. MGH contends that it is unlikely the seizure ordered even mentioned any of the agreements or MGH.[19]

47.    MGH directs the Tribunal's attention to article 5.2 of the SPA, which states:

> 5.2    <u>No Conflicts; Consents</u>. The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which have been obtained.

48.    According to MGH, even if the seizure order prohibited or restrained the SPA and the Investment Agreements, Hamilton was in breach of its contractual

---

[19] As noted, the seizure order was not provided in the information exchange phase and was not submitted into evidence.

representations. In connection with the representations, MGH elicited the following testimony from Ms. Adonis-Roberts:

> Q Okay. So in terms of allocation of risk, you understood the truth or falsity of these representations, that risk fell on Hamilton alone.
>
> Do you understand that?
>
> A Representations and warranties made by the buyer would fall on the buyer, yes.

TR. 206:16-21.[20]

49.     Next, MGH argues that Hamilton may not invoke a failure of condition precedent because a condition precedent may only be invoked before performance because performance is what the condition is precedent to, citing to *SLMSoft.com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *12 (Del. Super. Apr. 2, 2003) and other cases. Therefore, according to MGH, "conditions precedent cannot be invoked after performance is due or **has commenced**" (emphasis added). Here, performance commenced (the Parties signed the agreements) but was not completed (funds to be exchanged for shares of stock).[21]

50.     Next, MGH argues that even if Hamilton could have invoked the failure of a condition precedent at one time, Hamilton needed to assert that defense immediately, citing *Amirsaleh v. Bd. of Trade of City of N.Y.*, 27 A.3d 522, 529 (Del. 2011) and other cases.

51.     Regarding damages, MGH seeks expectation damages quantified either as:

- $118,611,623, based on the $37 million called for by the Investment Agreements.

---

[20] "TR." refers to the transcript of the merits hearing.

[21] MGH cites to no legal authority for the proposition that a failure of a condition precedent in these circumstances cannot be invoked.

- $313,909,958, based on the full $100 million investment that MGH expected to be invested by Hamilton.[22]

52.     MGH argues that expectation damages are "based on the reasonable expectations of the parties that existed before or at the time of the breach" *citing PharmAthene, Inc. v. SIGA Techs., Inc.*, 2014 WL 3974167, at *7 (Del. Ch. Aug. 8, 2014). MGH also argues that later events that do not transpire as expected (such as a disruption to the cryptocurrency markets) are not relevant in assessing damages, *citing Cura Fin. Servs. N.V. v. Elec. Payment Exch., Inc.*, 2001 WL 1334188, at *20 (Del. Ch. Oct. 22, 2001).

53.     Applied to the facts here, MGH submits that the "McKenzie Valuation" (CX 8) reflects the expectations of the Parties and should be used in calculating damages. CX 61 shows that Hamilton's Director, Mr. Kin Ming Je (also known as William Je) used these projections to raise funds from investors to effectuate Hamilton's investments in MGH. According to MGH, Hamilton should be held to those projections. Further, MGH argues, Hamilton offered no evidence showing that MGH failed to take appropriate steps to mitigate its damages in response to Hamilton's breach nor has Hamilton attempted to quantify the amount of damage MGH might have avoided through additional steps it claims MGH should have taken.

54.     Regarding the alternative damages theory of the difference between contract price and market value, MGH notes that it tried to sell securities to others after the Hamilton transactions failed to close but received no offers. This is unremarkable, MGH says, because the shares that would have been issued to Hamilton are not easily transferable, given their lack of registration and the regulatory permissions required for a direct or indirect change of control.

---

[22] MGH concedes that there was no signed writing that committed Hamilton to invest $100 million in MGH. MBI, however, represented to OCIF that Hamilton "expects to raise approximately US$100 million from sophisticated investors, most of which is expected to be invested in MGH and, in turn, contributed as equity to MBI for general corporate purposes." CX 9, at 5.

Analogizing the sale of securities here to a hypothetical sale of goods under Article 2 of the Uniform Commercial Code, MGH argues a seller may recover the full contract price even if tender is impossible where the "goods" to be sold were "lost or damaged . . . after the risk of their loss has passed to the buyer." 5A Del. Ch. 1953, §2-709(1)(a). Hamilton's obligation, MGH says, under circumstances where Hamilton knew it had the risk of loss, is equivalent to a buyer of goods that are "damaged" or "destroyed" because the shares that Hamilton would have received cannot be readily reissued to a new buyer, even if there were a new buyer expressing interest.

55.     Due to the September 16, 2022 deadline to close imposed by OCIF, if an analogy to the sale of goods is useful, MGH asserts, the "goods" are like a custom cake that will spoil overnight. The shares to be issued to Hamilton were specifically for this transaction and could only be sold to the buyer approved by OCIF and only if payment were made by September 16. Therefore, it would not be appropriate to take any deduction for the value of shares that can no longer be sold to Hamilton or anyone else.

56.     MGH concludes its post-hearing brief with the statement "it is appropriate to offset the $450,000 loan described in the Line of Credit Security Agreement that Hamilton introduced into evidence."

## VI.     ANALYSIS

### A. Issue One: Should the Investment Agreements and the SPA be Considered as a Single, Integrated Transaction?

57.     Hamilton has the better argument here. Courts in Delaware regularly treat related contemporaneous documents as one contract, especially where the contracts are separate steps of a single integrated scheme. *Doehler*, 2023 WL 3569775, at*3; *Greenstar IH Rep, LLC v. Tutor Perini Corp.*, 2019 WL 6525206, at *9 (Del. Ch. Dec. 4, 2019) *Ashall Homes*,992 A.2d at 1250-51.

58.     That result is appropriate here because it was not possible to close on the Investment Agreements without closing on the SPA. OCIF never approved the sale of the shares in the Investment Agreements without the simultaneous sale of the shares in the SPA. *See* CX 10, at 3, defining the Transaction to be approved as "[t]he Outstanding Shares Purchase *and* the Newly Issued Shares Purchase" (emphasis added).

59.     Therefore, the Tribunal concludes that if Hamilton had a valid excuse to rescind the SPA, that excuse applies to the Investment Agreements as well.

## B. Issue Two: Is Hamilton's Performance Excused under Article 8.1 of the SPA?

60.     This is a closer call, but MGH has the better argument. When both sides signed the Investment Agreements, the uncontradicted evidence shows that both sides understood that there were sufficient funds at Silvergate Bank and they expected the wire transfer to be made without delay or incident.[23] As noted above, article 8.1 of the SPA makes the entire transaction voidable if there is a governmental order "restraining or prohibiting consummation" of the transactions. Under the circumstances, it is plausible to define "restraining" as "inhibiting" the transactions and the seizure order arguably inhibited the transactions.

61.     But that does not give Hamilton the right to avoid its contractual commitments. That is because in article 5.2 of the SPA, Hamilton represented that "[t]he execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not…(b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer." As conceded by Ms. Adonis-Roberts (TR. 206:16-21), as to "the truth or falsity of these representations, that risk fell on Hamilton alone." In

---

[23] Hamilton has not invoked the doctrine of mutual mistake. Therefore, the Tribunal does not consider that doctrine as an excuse for nonperformance.

other words, the seizure of Hamilton's funds gave MGH the option of avoiding the transactions, but not Hamilton, because Hamilton assumed that risk.

62.     Therefore, the Tribunal concludes that Hamilton had no valid excuse to avoid its obligations under the Investment Agreements.

### C. Issue Three: Do the Doctrines of Waiver and Estoppel Bar Hamilton from Invoking Failure of Condition Precedent?

63.     Given the Tribunal's decision on Issue Two, I need not reach the issue of waiver and estoppel. For completeness, the Tribunal notes that Hamilton has the better argument.

64.     "Waiver is the voluntary and intentional relinquishment of a known right." *In re Coinmint, LLC*, 261 A.3d 867, 893 (Del. Ch. 2021). As the party asserting waiver, MGH was required to demonstrate waiver with "unequivocal facts." *Id*. MGH offers no proof that Hamilton intended to waive its rights under the agreements. Indeed, in the case it relies on, *Amirsaleh*, the court noted that the standards for demonstrating waiver are "quite exacting." 27 A.3d at 529. In that case, the defendant expressly waived a deadline by accepting late delivery of certain instruments. *Id*. MGH offers no authority holding that mere silence constitutes waiver.

65.     To establish estoppel, MGH was required to prove, among other things, that it lacked knowledge of the truth of the facts in question and detrimentally relied on Hamilton's words or conduct. *See U.S. Bank Nat. v. Swanson*, 918 A.2d 339, at *2 (Del. 2006). MGH and Hamilton both believed that there was no impediment to funding on September 16 and were initially unaware of any action by the Government. Both sides learned of the Government seizure at around the same time and both tried to obtain the release of the funds. There is no evidence in the record that Hamilton misled MGH regarding the funds' seizure.

66.     That the legal basis for Hamilton's alleged excuse was made for the first time in a submission in this Arbitration is of no moment. MGH simply has not established waiver or estoppel.

## D. Issue Four: Has MGH Proved Future Lost Profit Damages?

67.    Claimant's future lost profits damages are based on the McKenzie Valuation of MBI as of December 31, 2021 (CX 8), which Hamilton used to raise funds from investors to effectuate Hamilton's investments in MGH (*see* CX 61). McKenzie, however, only performed arithmetic on projections supplied to it by the Parties. Page one of the McKenzie Valuation states:

> Our report is based on the information provided by your Company and team of advisors, which include, amongst other information, historical financial statements, company information, and other relevant materials to this valuation. We have not audited or verified any of the information that has been provided to us by your team, and if matters had been materially different from the information provided, we might have come to a different opinion. Accordingly, we accept no responsibility for the underlying data presented in this report. The potential users of this report should be aware that valuations are based on potential future earnings and will probably vary from the projections in this valuation, and the variations could be material.

68.    Claimant's expert on damages, in turn, relied on the McKenzie Valuation:

> To ascertain [MGH's expected income], we relied on the income projections and valuation from the appraisal of MBI that McKenzie & Associates prepared for Hamilton in January 2022.

Expert Report of Hekman and Abshier at 22.

69.    At the hearing, Dr. Hekman testified as follows:

Q If those [earnings projections that are contained in the McKenzie report] are inaccurate or for whatever reason can't be relied upon, then neither could your opinions of value; correct?

A It would certainly affect my opinion. Well, specifically, my opinion is driven by the forecast of the first year's earnings in the new investment.

Q Right. So the 42 million of first year earnings projection that comes in the McKenzie report; right?

A Yes.

Q So if that number, for whatever reason, if that's just unreliable and can't be relied upon, then you can agree that your opinions 2 and 3 [regarding future lost profits] also could not be relied upon?

A Well, they would not be accurate if that number is not accurate, right. They do rely on it.

TR. 272-73.

70.    There has been no showing that the projections had any basis in reality. MBI's own financial statements (Exhibit 1 to the McKenzie Valuation) show it was not making profits in 2020 and 2021:

|  | 2019 | 2020 | 2021 |
| --- | ---: | ---: | ---: |
| Revenue | 465,013 | 157,962 | 855,094 |
| COGS | – | – | – |
| **Gross Profit** | **$465,013** | **$157,962** | **$855,094** |
| Operating Expenses | (50,080) | (258,000) | (1,389,101) |
| **EBITDA** | **$414,933** | **($100,038)** | **($534,007)** |
| Adjustment | – | – | – |
| **Adjusted EBITDA** | **414,933** | **(100,038)** | **(534,007)** |

CX 8 at 34.

71.    What MGH offers is a classic hockey stick projection, that is, one that shows the company's last few years of actual results as flat or declining and then sharply turning up for future years in the shape of a hockey stick.[24] The projection (Exhibit 20 to the McKenzie Valuation) shows past losses and dramatically rising future projected earnings:

---

[24] *See, e.g.*, Berkshire Mergers And Acquisitions Glossary, available at https://berkshirebsa.com/mergers-and-acquisitions-glossary/ ("**Hockey Stick**: the general shape and form of a chart showing revenue, customers, cash or some other financial or operational measure that increases dramatically at some point in the future. Entrepreneurs often develop business plans with hockey stick charts to impress potential investors.")

**Exhibit 20**
Mercantile Bank International
Discounted Cash Flow Valuation
Valuation Date: 12/31/2021

|  | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|
| Free Cash Flow to Firm | ($196,028) | ($50,702) | $9,021 | ($5,017,680) | $41,059,829 | $135,500,903 | $1,156,253,406 |
| Partial Period Adjustment | – | – | – | 1.00 | 1.00 | 1.00 | 1.00 |
| Partial Period Adj. FCFF | – | – | – | ($5,017,680) | $41,059,829 | $135,500,903 | $1,156,253,406 |
| Discount Factor[1] | – | – | – | 0.83 | 0.58 | 0.40 | 0.28 |
| Present Value of Free Cash Flow | – | – | – | ($4,181,400) | $23,761,475 | $54,454,774 | $322,689,105 |
| Business Enterprise Value | $396,723,954 | | | | | | |

CX 8 at 53.

72.     The Tribunal finds these projections to be unreliable as a matter of fact. [25]

73.     As a matter of law, moreover, expectation damages are not available unless they can be proved with reasonable certainty. *See, e.g., Callahan v. Rafail*, 2001 WL 283012, at *1 (Del. Super. Mar. 16, 2001)); *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2004 WL 1192602, at *4 (Del. Ch. May 28, 2004). Speculative damages are not recoverable. *See Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 571 (Del. Super. Ct.), *aff'd*, 886 A.2d 1278 (Del. 2005) ("[D]amages which are considered too remote and speculative are not recoverable. Where actual pecuniary damages are sought, there must be evidence of their existence and extent, and some data from which they may be computed," *quoting* 24 Williston on Contracts, § 64:8 (4th Ed. 2002)).

74.     In addition, "Delaware courts regularly refuse to award damages based on the lost profits from a new business, deeming evidence of lost profits to be too speculative, uncertain, and remote when there is no history of prior profits." *Metro*

---

[25] That Mr. Je has been indicted on multiple counts of securities fraud and wire fraud (*see* CX 53) calls into question whether the projections, made to solicit investors, were made in good faith.

*Storage Int'l LLC v. Harron*, 275 A.3d 810, 860 (Del. Ch. 2022) (citing *In re Heizer Corp.*, 1990 WL 70994, at *3 (Del. Ch. May 25, 1990) (declining to award lost profits for a "start-up" company whose ability to generate profits, in any amount, was entirely speculative)).

75.    MGH instead attempts to argue that where the fact of damages is established, certainty is not required (MGH Post-Hearing Brief at 9). However, as a case cited by MGH demonstrates, "future lost profits must be established by 'substantial evidence' and not by speculation." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *29 n.271 (Del. Ch. Feb. 18, 2010).

76.    The Tribunal agrees with Hamilton and holds that the projections in the McKenzie report are an insufficient basis to award lost profits under Delaware law, as discussed in the cases referenced above. For these reasons, the Tribunal finds that MGH has not proved that its future lost profit damages are reasonably calculable or non-speculative.[26]

### E.    Issue Five: Has MGH Proved Damages Based on the Difference Between the Contract Price and Market Value?

77.    On this issue, each side has staked out extreme positions. MGH claims that the market value of the shares Hamilton committed to purchase was zero. MGH analogizes the shares to a cake that becomes worthless when stale. Hamilton claims that the market value of the shares was equal to the contract price because the contract price was negotiated in an arms-length transaction.

---

[26] During the redirect examination of Mr. Abshier, he testified that "MBI does not lend off of deposits." Mr. Collins then interjected: "A hundred percent of our money in overnight cash." TR. 258. This unusual business model would also cast doubt on the reliability of the projections. *See* Hamilton Post-Hearing Brief at 42: "Dr. Hekman also adopted this $42 million income figure from the McKenzie Valuation without connecting any of the dots to explain how Hamilton's injection of capital would lead MBI to generate $101 million of new revenue in the span of only a year. . . Dr. Hekman also accepted this 'fantastic' $42-million-dollar figure for a financial entity that primarily generates revenue through fees and interest earned in the overnight funds market."

78.     Neither position is tenable. Clearly, MGH is looking for new investors and will issue shares that are similar to those to have been issued to Hamilton. For those shares, MGH will receive money. Had such a transaction happened already, the money received for those shares would have been the resale price to be deducted from the contract price. There having been no such transaction, the market value, to be deducted from the contract price, must be estimated.

79.     Hamilton's position is also flawed. Had the shares been worth the contract price, another purchaser would have stepped in. Clearly the shares were worth $37 million *to Hamilton*, but there is no proof that any other market participant valued the investment at that price.[27]

80.     Due to these extreme positions, neither side's experts made an estimate of market value when presenting their opinions. During colloquy at the hearing, MGH's expert on damages, Dr. Hekman offered this testimony:

> In my mind the way to offset that is to say how long would it take them to get a replacement investment and then get the present value of what that would be and that would be the offset.
>
> ARBITRATOR SKULNIK: How would you estimate it?
>
> DR. HEKMAN: Well, it would be very speculative, but let's say -- I don't know whether Dave said that they might get 20 million at some point.
>
> * * *
>
> So the 20 million, really optimistically two years after the breach, you discount that one year 40 percent, 20 times that brings you down to 12, right.
>
> ARBITRATOR SKULNIK: And then another year and do another 40 percent.

---

[27] Inasmuch as Mr. Je has been indicted for money laundering, it cannot be excluded that taking ownership of a US bank was of more value to Hamilton than it would be to other potential buyers.

> DR. HEKMAN: And then another year would bring you down to like 8.
> So 8 million, if you get 20 million two years from now it's only worth 8.

TR. 381-82

81.     Hamilton's damages expert, Mr. Hock, agreed with the approach but not with discount rate proposed by Dr. Hekman:

> Well, my only comment was going to be I don't necessarily disagree with the concept of if I get $20 million from two years from now, I don't know that I think you discount that at the same 40 percent that you're doing the valuation on, that's all.
>
> ARBITRATOR SKULNIK: What discount rate would you apply?
>
> MR. HOCK: It's really more of a passage in time issue at that point --
>
> * * *
>
> Well, prime rate is about 8 and a quarter right now, I could get behind that. I would even look at like a corporate bond rate, some sort of weighted average cost of capital rate.
>
> Maybe even look at some of these comparable companies and see what their cost of capital is maybe. You could certainly add a few percentage points maybe if you want to say there's a little bit of additional risk. But I don't think you're talking about the same level of risk as you're talking about when you're doing a business valuation if you're using it to discount a future investment.

TR. 381-84.

82.     The Tribunal accepts both sides' estimate of $20 million in two years discounted to the date of breach, September 16, 2022.[28] The Tribunal credits Mr. Hock's explanation that the discount rate for a lump sum investment in two years should be close to the company's cost of funds, *i.e.,* the prime rate plus a few percentage points.

---

[28] The Tribunal acknowledges that this value is no more than a guess. It is, however, the *only* estimate offered in this case. The Parties had adequate opportunity to provide an estimate of market value. Instead, both sides opted to "shoot the moon."

83. The Tribunal adopts a discount rate of $10%. Discounting $20 million in two years at that rate yields a value of $16,388,190.86. The difference between the contract price ($37,089,253.00) and market value ($16,388,190.86) is $20,701,062.14. From this amount, MGH concedes that it is appropriate to offset the $450,000 loan drawn under the Line of Credit Security Agreement. Therefore, MGH is entitled to damages in the amount of $20,251,062.14.

## F. Interest

84. MGH argues "Prejudgment interest should also be awarded, as it is as a matter of right in Delaware." Claimant's Post-Hearing Brief at 23. Hamilton does not contest that assertion.

85. Claimant's experts apply an interest rate of 2.68%. Expert Report of Hekman and Abshier at 17-18. The Tribunal accepts this interest rate. Article 34(4) of the ICDR Rules provides that arbitral tribunals may specify simple or compound interest "as it considers appropriate." Delaware courts have "traditionally disfavored compound interest." *CIGNEX Datamatics, Inc. v. Lam Rsch. Corp.*, 2021 WL 212692, at *2 (D. Del. Jan. 21, 2021), *quoting Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002). There are no circumstances here to depart from the general rule.

86. The Tribunal directs that simple interest a rate of 2.68% apply to the amount of this Final Award from September 16, 2022 until the earlier of when this Final Award is paid or the date this Final Award is confirmed and merged into a money judgment.

## G. Counsel Fees and Costs

87. Article 37 of the ICDR Rules provides the that arbitrators may award reasonable legal and other costs incurred by the parties:

R-37. Costs of Arbitration

The arbitral tribunal shall fix the costs of arbitration in its award(s). The tribunal may allocate such costs among the parties if it determines

that allocation is reasonable, taking into account the circumstances of the case. Such costs may include:

*       *       *

 d. the reasonable legal and other costs incurred by the parties.[29]

88. Although MGH sought damages substantially in excess of those awarded, MGH nevertheless achieved a large damages award. The Tribunal finds that MGH is the prevailing party and, in its discretion, grants MGH its reasonable counsel fees and certain of its other costs.

89. The Tribunal grants the following fees and expenses, which it finds to be reasonable given the size and complexity of this case:

- $942,484.16, representing the value of Crowell & Moring's time at their prevailing rates for this matter.[30]

- $52,056.25, representing fees charged by counsel at Ferraiuoli LLC.[31]

- $6,418.41 in transcription costs for the court reporter during the hearing.

- $18,067.61 relating to travel, food, and lodging to attend the hearing.[32]

---

[29] Section 9(a) of the Investment Agreements provides that "[t]he arbitrator may include, in the award, an assessment of expenses of arbitration and the costs thereof with an award of reasonable attorney fees to the prevailing party."

[30] Crowell & Moring advised the Tribunal that it rendered its services to MGH on a contingency fee basis. These fees represent the value of Crowell & Moring's time at its prevailing rates.

[31] Ferraiuoli has not stated whether these fees have been billed and paid or represent the value of its time at its prevailing rates.

[32] MGH also seeks unspecified disbursements of both law firms totaling $17,794.66. Without any detail, the Tribunal can make no assessment of reasonableness and the request for those expenses is denied. MGH also seeks $90,002.54 to compensate its expert witnesses. The Tribunal finds that MGH's experts merely performed arithmetic on unreliable forecasts and assumptions. Because the experts' work was not useful to the Tribunal, their fees and expenses are denied.

27

90.     Accordingly, the Tribunal awards Claimant's counsel fees and disbursements in the total amount of $1,019,026.43, plus administrative fees of the ICDR and Tribunal compensation that are detailed in paragraph 93 *infra*.

## VII.   AWARD

WHEREFORE, for the reasons set forth above, the Tribunal hereby declares and **AWARDS** as follows:

91.     The Tribunal awards damages to Claimant MGH of $20,251,062.14. Respondent Hamilton shall pay simple interest on that amount to Claimant MGH at the rate of 2.68% per annum from September 16, 2022 until the earlier of when this Final Award is paid or the date this Final Award is confirmed and merged into a money judgment.

92.     Respondent Hamilton shall reimburse Claimant MGH's costs and counsel fees in the amount of $1,019,026.43. Respondent Hamilton shall pay simple interest on this amount to Claimant MGH at the rate of 2.68% per annum from the date of transmittal of this Final Award to the Parties by the ICDR until the earlier of when this Final Award is paid or the date this Final Award is confirmed and merged into a money judgment.

93.     The administrative fees of the ICDR totaling $69,000.00 and the compensation of the Tribunal totaling $39,260.00 shall be borne by Respondent Hamilton. Therefore, Respondent Hamilton shall pay to Claimant MGH the sum of $85,780.00 representing that portion of fees and compensation previously advanced by Claimant MGH to the ICDR. Respondent Hamilton shall pay simple interest on this amount to Claimant MGH at the rate of 2.68% per annum from the date of transmittal of this Final Award to the Parties by the ICDR until the earlier of when this Final Award is paid or the date this Final Award is confirmed and merged into a money judgment.

94.     This Final Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied in their entirety.

I hereby certify, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, that this Final Award was made in New York, N.Y., United States of America.

Dated: September 13, 2023
New York, New York

_____
Steven Skulnik
Sole Arbitrator


State of NEW YORK                )
                                 ) SS:
County of NEW YORK               )

I, Steven Skulnik, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

September 13, 2023          _____
                                 Steven Skulnik

29